UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRIDGE STREET AUTOMOTIVE, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 12-10750-PBS |
| GREEN VALLEY OIL, LLC and ARFA ENTERPRISES, INC., | ) ) ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## ARFA'S MOTION FOR SUMMARY JUDGMENT

October 17, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action was brought by a group of seventy-four gasoline station owners against

defendants, Green Valley Oil, LLC ("Green Valley") and ARFA Enterprises, Inc.

("ARFA"), to recover, among other things, security deposits that were held by Green

Valley in its capacity as the plaintiffs' landlord and gasoline supplier.  Green Valley does

not dispute that it owes the plaintiffs over $1.6 million in security deposits, but it

contends that it is out of business and has no assets.  Accordingly, the plaintiffs have

sought to recover the amounts due to them from ARFA, based on allegations that ARFA

was Green Valley's alter ego, and that it unlawfully obtained funds, including rent and

security deposits, that the plaintiffs had paid to Green Valley.

Since the inception of the litigation, seventy-three of the plaintiffs have been dismissed from the action due to lack of prosecution[1] or as the result of a settlement, and a number of the plaintiffs' original claims against ARFA have been withdrawn or dismissed by the court.  Consequently, only one plaintiff, Gaby Elnakhle, d/b/a G&E Getty ("Elnakhle"), remains in the case, and the claims remaining against ARFA consist of claims for unjust enrichment (Count VI), conversion (Count VII), fraudulent transfer (Count VIII), and alter ego liability (Count X).

The matter is presently before the court on the "Motion of ARFA Enterprises, Inc. for Summary Judgment." (Docket No. 148).  By its motion, ARFA is seeking summary judgment, pursuant to Fed. R. Civ. P. 56, on the merits of each of Elnakhle's remaining claims against it.  In addition, ARFA contends that it has no contacts with Massachusetts, either generally or with respect to the particular claims at issue, and that therefore, it is entitled to summary judgment based on a lack of personal jurisdiction.  As described below, this court finds that ARFA lacks sufficient contacts with Massachusetts to support this court's assertion of personal jurisdiction over it.  Moreover, to the extent Elnakhle is relying on an alter ego theory to establish that Green Valley's contacts with Massachu-setts should be imputed to ARFA for purposes of personal jurisdiction, this court finds

---

[1]  In most cases, after the plaintiffs' first attorney withdrew from the litigation, corporate plaintiffs sought to proceed pro se.  This is prohibited by Local Rule 83.5.3(c).  See Instituto de Educacion Universal Corp. v. U.S. Dep't of Educ., 209 F.3d 18, 22 (1st Cir. 2000) ("a non-lawyer may not represent a corporation in ongoing proceedings").  When the plaintiffs did not obtain successor counsel, their cases were dismissed for lack of prosecution.

that the undisputed facts are inadequate to show that ARFA is an alter ego of Green Valley. Therefore, while it is very unfortunate that Elnakhle has suffered financial loss through no fault of his own, and may have no ability to recover any portion of his security deposit despite Green Valley's admission of liability, this court recommends to the District Judge to whom this case is assigned that ARFA's motion for summary judgment be ALLOWED, and that this case be dismissed for lack of personal jurisdiction. In light of this recommendation, this court does not reach the merits of the claims brought against ARFA.

## II.  **STATEMENT OF FACTS**

### **Scope of the Record**

During oral argument on the defendant's motion for summary judgment, ARFA noted that Elnakhle had failed to file a statement of facts pursuant to Local Rule 56.1, or to submit any affidavits or other evidence in support of his opposition to the motion. Accordingly, ARFA argued that the facts set forth in its statement of material facts should be accepted as true for purposes of summary judgment. Although the plaintiff did not dispute that he had failed to submit evidence at the summary judgment stage, he urged this court to consider the Affidavit of George Jriej ("Jriej"), which had previously been filed by the plaintiffs in connection with their opposition to ARFA's motion to dismiss. This court finds that it is appropriate to consider Jriej's testimony under the circumstances presented here.

Ordinarily, under Local Rule 56.1, "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."  However, this court finds that an exception should be made in this case.  At the time Elnakhle filed his opposition to the motion for summary judgment, the plaintiffs' prior counsel had withdrawn from the case and Elnakhle was proceeding pro se.  Moreover, although Elnakhle's present counsel filed an appearance before this court heard oral argument on the motion, he had limited time to review the docket, which is substantial, and prepare to defend against summary judgment at the hearing.  Under these circumstances, it was not unreasonable for Elnakhle's new counsel to ask the court to consider the Jriej Affidavit, which has been on the court's docket, and has been part of the record in this case, since June 7, 2012.  (See Docket No. 66).  Therefore, this court concludes that the Affidavit should be deemed part of the record for purposes of summary judgment.[2]  Nevertheless, as detailed below, the Affidavit is insufficient to establish the existence of disputed facts.

---

[2]  In addition to the Jriej Affidavit (Docket No. 66) ("Jriej Aff."), the facts are derived from the following materials: (1) the Defendant ARFA Enterprises, Inc.'s Local Rule 56.1 Statement of Material Facts (Docket No. 150) ("DF"); (2) the Affidavit of Alex Prakhin in Support of ARFA's Motion for Summary Judgment (Docket No. 151) ("Prakhin Aff."); (3) the Affidavit of Semyon Logovinsky (Docket No. 152) ("Logovinsky Aff."); (4) the Affidavit of Jay R. Strouss (Docket No. 153) ("Strouss Aff."); (5) the Affidavit of Oleg Aliferov (Docket No. 154) ("Aliferov Aff."); and (6) the Affidavit of Darah Schofield in Support of ARFA Enterprises, Inc.'s Motion for Summary Judgment (Docket No. 155) ("Schofield Aff.").

## The Parties

At all times relevant to this action, defendant Green Valley was a Pennsylvania limited liability company with a principal place of business in East Providence, Rhode Island. (DF ¶ 5). Between 2009 and 2012, Green Valley leased gasoline stations and sold gasoline to station owners, or "dealers," in Maine, New Hampshire, Connecticut, Massachusetts, and Rhode Island. (Id. ¶¶ 2, 11). The plaintiff, Elnakhle, was one of the dealers who obtained gasoline and leased property from Green Valley in order to operate a gasoline station in Massachusetts. (See Am. Compl. (Docket No. 55) ¶¶ 21, 78-81). However, in 2012, Green Valley ceased its operations. (DF ¶ 5). Elnakhle claims that Green Valley has failed to return his security deposit and caused him to incur additional damages as well. (See Am. Compl. ¶¶ 103, 107).

Defendant ARFA is a New Jersey corporation, which was formed in 1985 and has a principal place of business in Pennsauken, New Jersey. (DF ¶¶ 1, 4). ARFA's business consists of selling and distributing gasoline and diesel fuel on a wholesale basis to customers located in southern and central New Jersey and in the Philadelphia area of Pennsylvania. (Id. ¶ 2). It also owns and leases gasoline stations that are located in New Jersey and Pennsylvania. (Id. ¶ 3). However, ARFA does not conduct business, and is not registered to do business, in Massachusetts. (Id. ¶¶ 1, 26). Nor does it maintain any employees, offices, customers, telephones, or bank accounts in the Commonwealth. (Id. ¶ 26). Moreover, it is undisputed that ARFA does not purchase or sell any product in

Massachusetts, does not advertise or solicit business here, and does not derive any of its revenue from sources located in this forum.  (Id.).

As detailed below, while ARFA and Green Valley operated in the same industry, and shared some employees, they maintained their status as separate entities.  Elnakhle has failed to establish that ARFA is the alter ego of Green Valley.

### The Formation of Green Valley

Green Valley was formed by Oleg Aliferov ("Aliferov").  (Aliferov Aff. ¶ 1).  During the time period from 1995 to 2009, Aliferov was employed by ARFA, where he was responsible for managing gasoline stations located in New Jersey and Pennsylvania, and for overseeing ARFA's environmental compliance, as well as its construction, repair and maintenance operations.  (DF ¶¶ 8-9).  In early 2009, Aliferov was offered an opportunity to lease gasoline stations that were located in New England from Getty Petroleum Marketing, Inc. ("GPMI"), and to sell gasoline through those stations.  (Id. ¶ 10).  Aliferov formed Green Valley in February 2009 in order to pursue this opportunity.  (Id.).  He has remained the sole member, manager and owner of Green Valley since that time.  (Aliferov Aff. ¶ 1).

After forming Green Valley, Aliferov continued to perform work for ARFA.  (See DF ¶ 10).  However, beginning in June 2009, he proceeded to wind down his responsibilities at ARFA and to transition his work to Green Valley.  (Id.).  Aliferov ultimately ceased working for ARFA on December 13, 2009.  (Id.).

During the period of its operations, Green Valley distributed and sold gasoline to dealers in New England.  (Id. ¶ 11).  It also leased a number of gasoline stations from GPMI, which it then subleased to third-party station operators, including Elnakhle.  (Id.).  Some of the security deposits that Green Valley obtained from the dealers were transferred to Green Valley from GPMI at the time Green Valley took over GPMI's leases.  (Id. ¶ 18).  Others were paid directly to Green Valley from the dealers at the time they began subleasing a gasoline station.  (Id.).

In order to carry out its leasing and gasoline distribution business, Green Valley took over GPMI's office space in Rhode Island.  (Id. ¶ 13).  It also hired 25 full time and 4 part-time employees who had been working for GPMI at that location.  (Id.).  Those employees, who remained at Green Valley's offices in Rhode Island, performed what is known in the gasoline distribution industry as "front of the house" operations.  (Id.).  Thus, Green Valley's Rhode Island employees were responsible for purchasing gasoline from suppliers, arranging for deliveries of gasoline to stations, maintaining relations with dealers, and handling such matters as advertising and human resources.  (Id.).

Green Valley's front of the house employees obtained automatic clearing house ("ACH") authorizations from the dealers, which allowed for the electronic transfer of money owed by each of the dealers to Green Valley.  (Aliferov Aff. ¶ 12).  Accordingly, monthly rental payments were automatically drafted from the dealers' bank accounts directly into Green Valley's account.  (Id.).  Payments for fuel that Green Valley distri-buted to the dealers' gasoline stations were initiated by the dealers themselves, through

the use Green Valley's website, and were then transferred to the defendant pursuant to

the ACH authorizations.  (<u>Id.</u>).  Thus, each dealer would enter certain financial data on a

secure section of the website dedicated to that particular dealer.  (<u>Id.</u>).  The entry of data

by the dealer would trigger the automatic transfer of money from the dealer's bank

account into Green Valley's account.  (<u>Id.</u>).  According to Aliferov, ARFA had nothing to

do with this process and never received any of these funds.  (<u>Id.</u>).  He also avers that

Green Valley maintained its own bank accounts, and that there was no intermingling of

Green Valley's funds with funds that were owned by ARFA.  (<u>Id.</u> ¶ 15).  However, as

described below, the plaintiffs allege that, at some point, ARFA obtained possession of or

control over at least one of the dealers' security deposits.  The plaintiffs have not

supported that allegation with any documentary evidence.

### Green Valley's Relationship with A.P. Petroleum

In addition to front of the house operations, gasoline distributors such as Green

Valley must perform "back office" operations.  (DF ¶ 14).  Those operations involve such

tasks as the maintenance of books and records, preparation of internal financial reports

and financial statements, and the tracking of dealers' daily operations, including gas

sales, deliveries and inventory.  (<u>Id.</u>).  They also require attention to such matters as

pricing of gasoline product, preparation of tax returns in cooperation with an accountant,

and similar administrative tasks.  (<u>Id.</u>).  While it was in operation, Green Valley decided

to outsource its back office work to a third party.  (<u>Id.</u>).  Accordingly, on January 11,

2010, Green Valley entered into a written contract with A.P. Petroleum Management,

LLC ("A.P. Petroleum") under which A.P. Petroleum agreed to provide back office support services to the defendant. (Id.; Prakhin Aff. ¶ 9 & Ex. A thereto).

A.P. Petroleum was formed by Alex Prakhin ("Prakhin"), who is the sole managing member of the company.  (DF ¶ 15; Prakhin Aff. ¶ 8).  He is also the President of ARFA.  (DF ¶ 15).  Despite this overlap, ARFA had no interest in A.P. Petroleum, and was not a party to its contract with Green Valley.  (DF ¶ 15; Prakhin Aff. ¶ 8). Moreover, despite being its President, Prakhin had no ownership interest in ARFA, which is owned solely by Semyon Logovinsky ("Logovinsky") and has always been owned by either Logovinsky or his wife.  (DF ¶ 4; Logovinsky Aff. ¶ 1).

Prakhin was one of two individuals who provided back office support to Green Valley on behalf of A.P. Petroleum.  (DF ¶ 16).  His primary role was to recommend prices for Green Valley to charge for its fuel, and to assist Green Valley with respect to tax related issues.  (Prakhin Aff. ¶ 11).  The other individual was Leon Degtar ("Degtar"), a young accountant who handled bookkeeping and related services.  (DF ¶ 16).  It is undisputed that Degtar was employed by ARFA during part of time when he was providing back office services to Green Valley, and that he also provided accounting services to ARFA and Green Valley, among other fuel distribution companies, during a period of employment with Green Valley's outside accounting firm of Strouss, Hui, Roomberg & Ellis ("Strouss").  (Id.).

Degtar was originally hired by ARFA in August 2009 in order to perform bookkeeping for the company.  (Id.).  At the time he began working for ARFA, Degtar

had no prior experience working in the fuel distribution business.  (Id.).  Because ARFA

believed that Degtar would benefit from more training and experience in the industry, it

allowed him to assist A.P. Petroleum in providing back office services to Green Valley

while remaining on ARFA's payroll.  (Id.).  Accordingly, Degtar's initial work for A.P.

Petroleum occurred while he was still employed at ARFA.  (Id.).

On March 21, 2010, Degtar stopped working for ARFA and became a full time

employee of A.P. Petroleum providing back office support services to Green Valley and a

company known as Petroactive Management.  (Id.).  Two months later, however, Degtar

left A.P. Petroleum in order to take a temporary position at Green Valley's outside

accounting firm, Strouss.  (Id.).  According to Prakhin, Degtar wanted to work for Strouss

so that he could obtain the experience necessary to become a certified public accountant.

(Prakhin Aff. ¶ 15).  Prakhin agreed that Degtar could take a six month leave of absence

from A.P. Petroleum in order to pursue that opportunity.  (Id.).  While at Strouss, Degtar

was assigned to perform accounting work for a number of fuel distribution companies.

(DF ¶ 16).  Those companies included both ARFA and Green Valley.  (Id.).

Degtar returned to A.P. Petroleum when his position with Strouss ended in

December 2010, and resumed his back office work for Green Valley.  (Id.).

Subsequently, in April 2011, Degtar was re-hired by ARFA.  (Id.).  Nevertheless, he

continued to assist A.P. Petroleum in providing back office support to Green Valley up

until the time when Green Valley ceased doing business in 2012.  (Id.).  Thus, Degtar

again performed work for Green Valley while he was employed at ARFA.

Throughout the time period when A.P. Petroleum was providing back office services to Green Valley, neither Prakhin nor Degtar made any organizational or management decisions for Green Valley, or had any responsibility for communicating with the plaintiffs.  (Id. ¶ 17).  Nevertheless, it is undisputed that Degtar was responsible for maintaining records regarding security deposits that Green Valley had received from the gasoline dealers.  (Id.).  Those records identified dealers who had paid the security deposits, as well as the amounts paid, and any interest that was owed on the deposits. (Id.).  ARFA denies that Dektar, Prakhin or A.P. Petroleum ever possessed or had control over the security deposits or any other funds that the plaintiffs had paid to Green Valley. (Id.).  It further denies that any money received from the plaintiffs was ever deposited into an ARFA bank account or that ARFA ever had any control over such funds. (Id.). As detailed below, these assertions are challenged by the plaintiff.

## ARFA's Operations

The record evidence before the court establishes that ARFA maintained operations that were separate from those of Green Valley.  Thus, ARFA has presented affidavits from its witnesses showing that the two companies were not affiliates, partners or joint venturers, and that neither company did business through, or acted as an agent of, the other.  (DF ¶ 20).  Additionally, the record indicates that the companies did not engage in a common enterprise, and did not hold themselves out as affiliates or as part of common enterprise.  (Id.).  Furthermore, it is undisputed that neither ARFA nor its owner, Logovinsky, ever held any type of ownership interest in Green Valley.  (Id.).  It is

similarly undisputed that neither Green Valley nor its owner, Aliferov, ever held any ownership interest in ARFA.  (Id.).

Although both companies were engaged in the gasoline distribution business, the record reveals that ARFA and Green Valley did not purchase products from or sell products to each other.  (Id. ¶ 23).  Moreover, ARFA has submitted testimony showing that ARFA and Green Valley maintained separate books and records, financial statements, and bank accounts.  (Id. ¶ 21).  In addition, ARFA had no involvement in Green Valley's management or organizational decisions, and did not conduct business with the plaintiffs.  (See Aliferov Aff. ¶ 13; DF ¶ 24).  In particular, the record shows that ARFA had no responsibility for communicating with the plaintiffs, had no role in negotiating or establishing Green Valley's contractual relationships with the plaintiffs, and had no involvement in Green Valley's delivery of gasoline to the plaintiffs.  (DF ¶ 24).

While ARFA contends that it did not lease property to or from Green Valley, the evidence does establish that Aliferov, through a separate entity that he had established, leased property from ARFA at the time he was running Green Valley.  (Id. ¶¶ 23, 25).  Specifically, Aliferov admits that while he was employed at ARFA, and later at Green Valley, he owned a company known as OAG, Inc. ("OAG"), which operated three gasoline stations that were leased from ARFA.  (Aliferov ¶ 18).  Under one of its leases, OAG had the right to use an office that was located in the office suite occupied by ARFA in New Jersey.  (Id.).  Aliferov claims that he continued to use that office, even after he terminated his employment with ARFA, because it was convenient and located near his

home.  (Id.).  However, he contends that Green Valley was his company, not ARFA's, and that he never took any direction from ARFA with respect to the management or operation of Green Valley.  (Id. ¶ 13).

### Plaintiff's Evidence of ARFA's Involvement

Elnakhle relies on the Affidavit of George Jriej to challenge ARFA's contention that it did not have possession of control over security deposits being held by Green Valley.  Specifically, Jriej claims in his Affidavit that during the time period that is relevant to this action, his wife operated two gasoline stations in Worcester, Massachu-setts that were leased and received gasoline from Green Valley.  (Jriej Aff. ¶¶ 1-5).  He further claims that in January 2012, Green Valley's supply of gasoline to the two stations became unpredictable and sporadic.  (Id. ¶ 7).  Consequently, Jriej contacted Joel Despres at Green Valley to inquire about the gasoline deliveries and the status of his security deposits, which were held by Green Valley.  (Id.).  Mr. Despres, whose position with Green Valley is undefined in the record before the court, allegedly explained that Degtar was responsible for the security deposits, and instructed Jriej to contact Degtar, who could be reached at ARFA's offices in New Jersey.  (Id.).

Jriej contends that he called ARFA's offices on three separate occasions and left messages on Degtar's voice mail asking Degtar to advise him on the status and return of his security deposits.  (Id. ¶ 8).  On approximately April 17, 2012, Degtar returned Jriej's call.  (Id.).  According to Jriej, "Mr. Degtar stated that ARFA had [his] security deposits" and that they "would be returned within thirty to sixty days."  (Id.).  However, Jriej never

received the security deposits, and his further efforts to reach Degtar by telephone proved unsuccessful.  (Id. ¶ 9).

There is no evidence, either in the Jriej Affidavit or elsewhere in the record, explaining why or how ARFA allegedly had Jriej's security deposits.  Although the parties exchanged documents, including some of ARFA's bank statements, there is no documentary support for the plaintiff's claim that ARFA had any of the plaintiff's security deposits.  In fact, during a pretrial conference that took place before the District Judge on February 4, 2013, plaintiffs' counsel conceded that apart from the Jriej Affidavit there was no further evidence showing that moneys were transferred between Green Valley and ARFA.  (Schofield Aff. ¶ 2).  At the argument on the motion for summary judgment, ARFA's counsel further established to this court's satisfaction that the plaintiffs' original counsel had requested all relevant documents, and that a review of the documents did not support plaintiffs' contention that ARFA held the security deposits at any time.  Accordingly, the only evidence before this court pertaining to ARFA holding the security deposits consists of the testimony set forth in the Jriej Affidavit.

The plaintiff has not established that the statements allegedly made by Messrs. Despres or Degtar are admissible or sufficient to defeat the motion for summary judgment.  Absent evidence that either man had the authority to bind either Green Valley or ARFA, the plaintiff has not established that these statements are admissions of party opponents and, therefore, not hearsay.  See Davila v. Corporacion de P.R., 498 F.3d 9, 17 (1st Cir. 2007) ("For a statement to qualify as an admission by a party-opponent, the

-14-

statement must be made by a party, a person authorized by the party to make statements on its behalf concerning the subject, or the party's agent or servant acting within the scope of his or her agency or employment.").  Even assuming that the statements are admissible, they do not rise to the level of "specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (internal quotations omitted).  In light of the detailed factual information concerning its role (or lack thereof) in the transactions with the plaintiffs presented by ARFA, one general statement allegedly made in response to an inquiry about an account not at issue in the motion before the court is insufficient to create a factual dispute for purposes of summary judgment.[3]  See id. at 252, 106 S. Ct. at 2512 (in ruling on a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Additional factual details relevant to this court's analysis are described below where appropriate.

---

[3]  In support of its motion for summary judgment, ARFA also called the court's attention to plaintiffs' answers to interrogatories in which the plaintiffs attest that they have "been informed" that "one of the plaintiffs contacted his bank and requested the telephone number of the account holder who initiated" the transaction which resulted in the electronically debited rent payments from the plaintiff's account, and was given a phone number which was answered "ARFA Enterprises."  (See Schofield Aff., Exs. 2-46 at Int. No. 3).  These answers are clearly hearsay and inadmissible.  Moreover, they are not inconsistent with the fact that individuals working on Green Valley's accounts were located in ARFA's office.  Assuming the evidence concerning the phone call was admissible, it still does not establish that the security deposits were held by ARFA at any time.

# III.  ANALYSIS

As described above, Elnakhle is seeking to recover his security deposit and other damages from ARFA based on claims for unjust enrichment, conversion, fraudulent transfer, and alter ego liability.  ARFA contends that it is entitled to summary judgment on the merits of these claims, and also on the grounds that the court lacks personal jurisdiction over ARFA.  The Supreme Court has instructed that "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of the claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."  Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 1191, 167 L. Ed. 2d 15 (2007).  As the Court explained, "'[w]ithout jurisdiction the court cannot proceed at all in any cause'; it may not assume jurisdiction for the purpose of deciding the merits of the case." Id. (quoting Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). Because this court finds that ARFA, either alone or under a theory that it was Green Valley's alter ego, has insufficient contacts with Massachusetts to support this court's exercise of personal jurisdiction over it, ARFA's motion for summary judgment should be allowed on this basis.

## A.  Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson, 477 U.S. at 256, 106 S. Ct. at 2514.  The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  See Vineberg, 548 F.3d at 56.  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

## B.   Personal Jurisdiction

This court first considers the question whether personal jurisdiction over ARFA is present based on ARFA's own contacts with Massachusetts.  For the reasons that follow, this question must be answered in the negative.

In order to exercise personal jurisdiction over a defendant, the court must find sufficient contacts between the defendant and the forum to satisfy both the state's long-arm statute and the due process clause of the Fourteenth Amendment.  Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994).  "[T]he Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States."  Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008) (quotations and citations omitted).  Accordingly, for purposes of evaluating whether this court has personal jurisdiction over ARFA, it is appropriate to dispense with the statutory inquiry and "proceed directly to the constitutional analysis[.]" Id.  See also Sawtelle, 70 F.3d at 1388 ("when a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards").

Due process requires the court to determine whether the defendant has maintained "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945) (quoting

Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 343, 85 L. Ed. 278 (1940)).

Accordingly, "[t]he accepted mode of analysis for questions involving personal jurisdic-

tion concentrates on the quality and quantity of the potential defendant's contacts with

the forum." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st

Cir. 1999).  "Jurisdiction is proper . . . where the contacts proximately result from actions

by the defendant *himself* that create a substantial connection with the forum State." Asahi

Metal Indus. Co., Ltd. v. Superior Court of Cal. Solano Cnty., 480 U.S. 102, 109, 107 S.

Ct. 1026, 1030, 94 L. Ed. 2d 92 (1987) (quotations and citation omitted).

        The court may exercise two types of personal jurisdiction – general or specific.

"General jurisdiction 'exists when the litigation is not directly founded on the defendant's

forum-based contacts, but the defendant has nevertheless engaged in continuous and

systematic activity, unrelated to the suit, in the forum state.'" Mass. Sch. of Law at

Andover v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998) (quoting United Elec., Radio

& Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992)).

"Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's

claims and a defendant's forum-based activities, such as when the litigation itself is

founded directly on those activities." Id.  In the instant case, there is no evidence that

ARFA engaged in any type of continuous and systematic activity in Massachusetts.

Therefore, this court must determine whether ARFA's contacts with the forum are

sufficient to meet the requirements for specific jurisdiction.  For the reasons that follow,

this court finds that they are not.

**Specific Jurisdiction Analysis**

"Determining whether the plaintiff has alleged sufficient facts for a finding of specific jurisdiction requires a three-part analysis." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 620 (1st Cir. 2001). "An affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction." Phillips Exeter Acad., 196 F.3d at 288. First, the court must decide whether the claim underlying the litigation directly "relates to or arises out of the defendant's contacts with the forum." Id. This "relatedness requirement" "focuses on the nexus between the defendant's contacts and the plaintiff's cause of action." Ticketmaster-New York, 26 F.3d at 206. It ensures that the defendant will not be subject to personal jurisdiction unless its contacts with the forum state caused the alleged harm. See id. at 207.

Second, the court must determine whether the defendant's contacts with the forum "represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." Sawtelle, 70 F.3d at 1389 (quotations and citation omitted). "[T]he cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." Id. at 1391. Voluntariness exists when a defendant deliberately has engaged in significant activities within the forum, but not when the defendant's contacts with the forum are "random, fortuitous, or attenuated" or result solely from "the unilateral activity of another party or a third person." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S. Ct. 2174,

-20-

2183-84, 85 L. Ed. 2d 528 (1985) (internal quotations and citations omitted).

Foreseeability exists when the defendant's conduct and connection with the forum state is

such that the defendant "should reasonably anticipate being haled into court there."  Id. at

474, 105 S. Ct. at 2183 (internal quotation and citation omitted).

Finally, if the first two parts of the test for specific jurisdiction are fulfilled, the

court must determine whether the exercise of personal jurisdiction is reasonable in light

of the so-called "Gestalt factors."  Sawtelle, 70 F.3d at 1394.  This requires the court to

consider "(1) the defendant's burden of appearing; (2) the forum state's interest in

adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective

relief; (4) the judicial system's interest in obtaining the most effective resolution of the

controversy; and (5) the common interests of all sovereigns in promoting substantive

social policies."  Id.  Even when the lawsuit arises out of the defendant's purposefully

generated contacts with the forum, therefore, the court may decline to exercise personal

jurisdiction if doing so would be unreasonable and fundamentally unfair.  See Burger

King, 471 U.S. at 476-78, 105 S. Ct. at 2184-85; Ticketmaster-New York, 26 F.3d at

209-10.  However, where, as here, the defendant's contacts with the forum are insuffi-

cient to satisfy either the "relatedness" or "purposeful availment" prongs of the jurisdic-

tional test, it is unnecessary for the court to conduct a jurisdictional analysis using the

Gestalt factors.

**Relatedness**

In evaluating relatedness, the court is mindful that "[q]uestions of specific jurisdiction are always tied to the particular claims asserted." Philips Exeter Acad., 196 F.3d at 289.  Thus, in contract cases, the court must determine "whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Id.  In tort cases, the court "must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." Id.  In the instant case, Elnakhle's direct claims against ARFA, consisting of claims for unjust enrichment, conversion and fraudulent transfer based on ARFA's alleged receipt of the plaintiff's security deposit or other funds, sound in tort.  Accordingly, this court must determine whether ARFA's alleged wrongful possession and/or control over any such funds arose out of its contacts with Massachusetts.  See Sawtelle, 70 F.3d at 1389 (in order to satisfy relatedness requirement, "the action must directly arise out of the specific contacts between the defendant and the forum state").

This court finds that the facts set forth in the record are insufficient to establish relatedness.  As an initial matter, there is not sufficient evidence from which a jury could reasonably find by a preponderance of the evidence that ARFA obtained any security deposits or other funds from Elnakhle.  See Anderson, 477 U.S. at 252, 106 S. Ct. at 2512 (in ruling on a motion for summary judgment, the judge's inquiry "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict").  Even assuming, arguendo, that the evidence could support an inference that ARFA had control over all of the dealers' security deposits, the record still

would be insufficient to show that ARFA's allegedly wrongful conduct occurred as a result of its contacts with the forum. As described above, the record demonstrates that ARFA conducts no business in Massachusetts, maintains no employees, offices, telephones or bank accounts in Massachusetts, engages in no purchases or sales of product here, does not advertise or solicit business in the Commonwealth, and does not derive any revenue from sources located in this forum. (DF ¶¶ 1, 26). Furthermore, there are no facts describing the circumstances under which ARFA allegedly obtained control over the plaintiffs' funds. Thus, there are no facts to establish that ARFA reached into the Commonwealth in order to access the dealers' security deposits. Even assuming, arguendo, that ARFA obtained the security deposits from Green Valley, there is no evidence that Green Valley was located in Massachusetts. Nor is there any evidence showing that funds were transferred to ARFA from the dealers' accounts in Massachusetts pursuant to the ACH authorizations that Green Valley had obtained from the plaintiffs. Accordingly, this court is unable to conclude that Elnakhle's claims against ARFA are related to the defendant's contacts with the forum.

To the extent Elnakhle contends that he was harmed in Massachusetts by actions that ARFA may have taken from its offices in New Jersey, any such claim also would be insufficient to meet the relatedness prong of the test for specific jurisdiction. Generally, in-forum effects of a defendant's extra-forum activities, without more, are inadequate to establish relatedness. See Mass. Sch. of Law, 142 F.3d at 36 ("We have wrestled before with the issue of whether the in-forum effects of extra-forum activities suffice to

constitute minimum contacts and found in the negative"), and cases cited.  Therefore,

Elnakhle has failed to satisfy the first element of the test for personal jurisdiction.

### Purposeful Availment

The plaintiff's failure to demonstrate relatedness alone is enough to defeat

personal jurisdiction.  Nevertheless, this court finds that the plaintiff's failure to satisfy

the purposeful availment prong of the jurisdictional test reinforces the conclusion that

jurisdiction based on ARFA's contacts with the forum is lacking.

"The purposeful availment inquiry . . . focuses on the defendant's intentionality.

This prong is only satisfied where the defendant purposefully and voluntarily directs his

activities toward the forum so that he should expect, by virtue of the benefit he receives,

to be subject to the court's jurisdiction based on these contacts."  Swiss Am. Bank, Ltd.,

274 F.3d at 623-24 (internal citations omitted).  In the instant case, the evidence

demonstrates at most that ARFA's only direct contact with Massachusetts may have

consisted of a telephone conversation initiated by Jriej in Massachusetts with Degtar in

New Jersey.  Such evidence is not adequate to show that ARFA purposefully and

voluntarily directed its activities toward Massachusetts.  See Mass. Sch. of Law at

Andover, 142 F.3d at 36 (concluding that defendant's participation in telephone call with

individual located in the forum, and subsequent mailing of documents into forum,

combined with participation in a meeting in the forum, were "insufficient to establish

purposeful availment").  Nor does it establish a significant enough connection that the

defendant "should reasonably anticipate being haled into court there."  Burger King

<u>Corp.</u>, 471 U.S. at 474, 105 S. Ct. at 2183 (internal quotation and citation omitted).

Therefore, this court cannot find, based on the present record, that ARFA has maintained

"certain minimum contacts" with the forum state "such that the maintenance of the suit

does not offend traditional notions of fair play and substantial justice." <u>Int'l Shoe Co. v.</u>

<u>Washington</u>, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945) (quotations and

citation omitted).

### C.   <u>Alter Ego Liability</u>

The next issue to be considered is whether this court has personal jurisdiction over

ARFA due to its alleged status as an alter ego of Green Valley.  As another judge in this

District stated in <u>Harrelson v. Seung Heun Lee</u>, 798 F. Supp. 2d 310 (D. Mass. 2011):

> federal courts have consistently acknowledged that it is compatible
> with due process for a court to exercise personal jurisdiction over an
> individual or a corporation that would not ordinarily be subject to
> personal jurisdiction in that court when the individual or corporation
> is an alter ego or successor of a corporation that would be subject to
> personal jurisdiction in that court .... The theory underlying these
> cases is that, because the two corporations (or the corporation and its
> individual alter ego) are the *same entity*, the jurisdictional contacts of
> one are the jurisdictional contacts of the other for the purpose of the
> *International Shoe* due process analysis.

<u>Harrelson</u>, 798 F. Supp. 2d at 315-16 (quoting <u>Patin v. Thoroughbred Power Boats, Inc.</u>,

294 F.3d 640, 653 (5th Cir. 2002)) (alterations omitted).  Here, there is no dispute that

Green Valley is subject to personal jurisdiction in this court.  However, because this court

finds that the record is insufficient to support Elnakhle's alter ego claim, Green Valley's

contacts with Massachusetts cannot be imputed to ARFA for purposes of personal jurisdiction.

The plaintiff's alter ego theory "depends on a piercing of the corporate form, an entity of which Massachusetts law is especially protective." Id. at 315.  "In Massachusetts, corporations 'ordinarily are regarded as separate and distinct entities.'" TechTarget, Inc. v. Spark Design, LLC, 746 F. Supp. 2d 353, 356 (D. Mass. 2010) (quoting Scott v. NG U.S. 1, Inc., 450 Mass. 760, 766, 881 N.E.2d 1125 (2008)). Accordingly,"corporate veils are pierced only in 'rare particular situations,' and only when an 'agency or similar relationship exists between the entities.'" Scott, 450 Mass. at 767, 881 N.E.2d at 1132 (quoting My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619, 620, 233 N.E.2d 748 (1968)).  Moreover, "[t]he corporate veil will be pierced . . . only to defeat fraud or to remedy injustice." Harrelson, 798 F. Supp. at 315.

Under Massachusetts law, corporate formalities may be disregarded and the corporate veil may be pierced under the following circumstances:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

Id. at 317 (quoting My Bread Baking Co., 353 Mass. at 619, 233 N.E.2d 748).

Massachusetts courts have identified the following twelve factors that are relevant to

determining whether these circumstances are present in a given case:

> (1) common ownership; (2) pervasive control; (3) confused inter-
> mingling of business assets; (4) thin capitalization; (5) nonobser-
> vance of corporate formalities; (6) absence of corporate records;
> (7) no payment of dividends; (8) insolvency at the time of the
> litigated transaction; (9) siphoning away of corporation's funds by
> dominant shareholder; (10) nonfunctioning of officers and directors;
> (11) use of the corporation for transactions of the dominant share-
> holders; and (12) use of the corporation in promoting fraud.

Id. (quoting Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 n.19, 736 N.E.2d 373

(2000)) (quotations and emphasis omitted).  Applying these factors to the evidence

presented here does not make out a case for veil piercing.

Although the record establishes that there was a close relationship between ARFA

and Green Valley, and that certain individuals performed work for both companies, it

does not establish that there was any common ownership or that ARFA controlled, much

less pervasively controlled, any of Green Valley's operations.  In particular, while it is

undisputed that ARFA's President, Prakhin, and one of its employees, Degtar, provided

back office support services to Green Valley it is undisputed that they did so in their

capacities as employees of A.P. Petroleum and not in their capacities as ARFA

employees.  Additionally, there are no facts showing that Prakhin, Degtar or ARFA

directed Green Valley's operations or had anything to do with its management or

organizational decisions.  On the contrary, the evidence establishes that Green Valley's

owner, Aliferov, was the sole managing member of Green Valley, and that he took no
direction from ARFA with respect to the management of his company.  (Aliferov Aff.
¶ 13).

The record is also insufficient to suggest that there was a failure to observe
corporate formalities.  The facts establish that both Green Valley and ARFA conducted
gas distribution operations, but that they did so in different states and under separate
management.  They also show that the companies maintained separate books and records,
financial statements, and bank accounts, and that they did not hold themselves out as
affiliates, joint venturers, agents or the like.  (See DF ¶¶ 1-3, 5-6, 12, 20-21).  Moreover,
there is no evidence that Green Valley was nothing more than a shell corporation or that
ARFA was using it for some kind of improper purpose.  See TechTarget, 746 F. Supp. 2d
at 356 ("In order to pierce the corporate veil, a court must conclude that the parent
corporation directed and controlled the subsidiary and used it for an improper purpose").
Thus, the evidence provides no basis for piercing the corporate veil.

As described above, the plaintiff argues that there is some evidence that ARFA had
control over at least some of the security deposits that should have been held by Green
Valley, which could suggest some confused intermingling of business assets.  Not only
does this court find that the "scintilla" of proffered evidence is insufficient to establish
the fact of ARFA's control, but it also finds that even assuming such control is
established, it would not, standing alone, be enough to pierce the corporate veil.  Massa-
chusetts courts will not disregard the corporate form absent evidence that "an agency or

similar relationship exists between the entities." <u>Scott</u>, 450 Mass. at 767, 881 N.E.2d at 1132 (quotations and citations omitted).  In the instant case, the plaintiff has not established that ARFA's alleged possession of or control over dealer security deposits occurred pursuant to any such relationship.  Furthermore, "[t]here is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing." <u>Birbara v. Locke</u>, 99 F.3d 1233, 1240 (1st Cir. 1996) (quoting <u>Evans v. Multicon Constr. Corp.</u>, 30 Mass. App. Ct. 728, 736, 574 N.E.2d 395, 400 (1991)).  Here, there is no evidence that the plaintiffs were misled about which corporate entity was obligated to them.  Rather, it is undisputed that Green Valley was the entity that had leased the gasoline stations to the plaintiffs and was contractually required to return their security deposits.  Nor is there any evidence that ARFA's alleged possession of or control over the security deposits occurred in connection with "any fraudulent or improper use of [Green Valley's] corporate form[.]" <u>TechTarget</u>, 746 F. Supp. 2d at 357 (finding plaintiff's allegations insufficient to support veil piercing where plaintiff alleged confused intermingling and pervasive control, but failed to allege that fraudulent activity was "related to any corporate manipulation").  At most, the evidence establishes that the plaintiff is in the very unfortunate situation of being owed funds by a failed entity.  The evidence "does not present a rare situation warranting piercing the corporate veil" of either Green Valley or ARFA.  <u>Scott</u>, 450 Mass. at 774, 881 N.E.2d at 1136 (internal quotations and citation omitted).  Therefore, this court concludes that it

lacks personal jurisdiction over ARFA, and that the defendant is entitled to judgment as a matter of law.

### D.      Merits of Plaintiff's Claims

In light of this court's lack of jurisdiction over ARFA, this court cannot adjudicate the merits of the plaintiff's claims.  Sinochem Int'l Co., Ltd., 549 U.S. at 430-31, 127 S. Ct. at 1191.  Therefore, the merits will not be addressed further herein.

## IV.  CONCLUSION

For all the reasons detailed herein, this court finds that ARFA's contacts with Massachusetts are insufficient to support this court's assertion of personal jurisdiction over that defendant, and that Green Valley's contacts with the forum cannot be imputed to ARFA pursuant to an alter ego theory.  Therefore, this court recommends to the District Judge to whom this case is assigned that the "Motion of ARFA Enterprises, Inc. for Summary Judgment." (Docket No. 148) be ALLOWED.[4]

---

[4]    The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).

 / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge